## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANTHONY MCCULLOUGH | Civil Action No. CCB-19-926 |
| v. | |
| ANNE ARUNDEL COUNTY, MARYLAND, *et al.* | |

## **MEMORANDUM**

Plaintiff Anthony McCullough was driving in Anne Arundel County late one night in July 2016 when Anne Arundel County police officer Corporal Paul Smith stopped him for speeding. The traffic stop escalated into an arrest (involving Smith and officer-co-defendants Radzibaba and Simmons), and McCullough sued the officers and Anne Arundel County for a variety of state and federal claims.

After a motion to dismiss, this court allowed claims for excessive force, due process and equal protection, battery, malicious prosecution, and gross negligence to proceed while bifurcating and staying state and federal charges aimed at the practices of the county police department. Following discovery, the defendants filed a motion for summary judgment (ECF 66, Mot. Summ. J.), to which McCullough responded in opposition (ECF 72, Opp.) and the defendants replied in support (ECF 83, Reply). The motion for summary judgment has been fully briefed, and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons stated herein, the court will grant the motion in part and deny the motion in part.

1

## BACKGROUND

On July 24, 2016, shortly after one o'clock in the morning, plaintiff Anthony

McCullough — an African-American resident of Glen Burnie — was driving his Toyota Celica

on Manchester Road in Anne Arundel County. That night, Corporal Paul Smith was conducting

radar traffic enforcement in the area of Ft. Smallwood Road and Manchester Road, where the

speed limit drops from 50 miles per hour to 35 miles per hour. When McCullough drove by just

before 1:10 a.m., Smith received radar readings between 49 and 50 miles per hour (ECF 66-4,

Ex. 2, Smith Dep. at 25), though McCullough disputes this and says he was driving at 25 miles

per hour at the time (ECF 72-2, Ex. A, McCullough Dep. at 235–36).[1] Smith initiated a traffic

stop, which was captured by Smith's dashboard camera.[2]

McCullough pulled over off Manchester Road and stopped his vehicle (1:10:32). About

30 seconds later, at the same time as Smith exited his cruiser to approach McCullough's car,

McCullough slowly pulled his car forward by about two car lengths (1:11:04) and stopped for a

second and final time (1:11:10). Smith returned to his vehicle (1:11:11), repositioned it

(1:11:16), and verbally commanded McCullough to put his hands out the driver's window

(1:11:18). Smith radioed for backup (1:11:32). McCullough, who had limited mobility due to his

weight and recent surgeries on both rotator cuffs, could not reach his right hand across his body

to put it out the driver's side window, and instead he put his left hand out the window and his

right hand slightly out of the sunroof, more easily within reach (1:11:45).

---

[1]  While the parties dispute the fact of McCullough's speed at the time, McCullough's Maryland Circuit Court speeding citation led to a Probation Before Judgment disposition (six months beginning July 26, 2017) that renders McCullough's unlawful speed undisputed. *See* n.9, *infra*.

[2]  ECF 66-5, Ex. 3, Video, VTS_01_1.VOB, hereafter referred to as "Dashboard Camera" or with parenthetical time references corresponding to the timestamp visible in the footage. For example, "(1:10:32)" means 1:10:32 a.m.

Smith, hand on his service weapon, approached McCullough (1:11:54). He asked why McCullough had moved his vehicle (1:12:00), noting he was concerned for his safety due to the move. McCullough explained that Smith's lights were in his eyes (1:12:06). Smith ordered McCullough to keep his hands up (1:12:00) and also to turn off his vehicle (1:12:21). After Smith asked him to turn off his vehicle, McCullough brought his hands down and inside his vehicle, and at that moment, Smith saw McCullough reaching with his right arm and displaying a dark object toward Smith (1:12:21). Smith believed it could be a gun (ECF 66-4 at 49) and reached into McCullough's car (1:12:22), grabbing the object from McCullough's hand and tossing it over McCullough's vehicle onto the ground (1:12:23–25). It was not a gun but rather a cell phone. McCullough indicated to Smith that he was trying to record the incident (1:12:25). McCullough says that Smith knew immediately that it was a cell phone; Smith says he did not determine until about 90 seconds later (1:14:39, after handcuffing McCullough) that it was a cell phone. The defendants' expert testified that Smith should have known within a second or two of holding the phone that it was not a gun. (ECF 72-6, Ex. E, Gleason Dep. at 88).[3]

Smith continued to command McCullough to turn off his vehicle. He reached into the car through the open window to grab at McCullough's keys and turn the engine off, but he was unsuccessful (1:12:28). At this point, the horn began to blow (1:12:29); Smith says that McCullough honked it in resistance, but McCullough says that Smith activated the car's security alarm when he reached into the car. Smith reached in again to try to turn the car off (1:12:32) but was unsuccessful. The horn continued to blow. Smith tried but failed to open the car door; he yelled at McCullough to get out of the car but simultaneously grabbed the top of the seatbelt, thereby pinning McCullough to the front seat (1:12:41). He then let go of the seatbelt (1:12:45).

---

[3] The plaintiff did not designate a use of force expert.

Smith unlocked the car door from the inside and successfully opened the driver's-side door (1:12:54), at which point he reached across McCullough's body to attempt to undo the seatbelt (1:12:57). Smith emerged from the car seconds later, pulling the seatbelt and again pinning McCullough (1:13:01).

Smith then attempted to remove McCullough from the car, grabbing his left forearm and pulling. At that moment, Officers Michael Radzibaba and Devin Simmons arrived (1:13:03). As Smith pulled McCullough's left arm, Radzibaba pulled his right arm (1:13:05) to extract McCullough from the car. The seatbelt appears to have been unlatched, though McCullough's left arm was still stuck through the triangle of the seatbelt. McCullough hit the ground at 1:13:07 but remained tangled and restrained in the seatbelt while he was dragged from the car. He experienced abrasions on his knees, and the hospital that examined him later that night applied one bandaid. (ECF 72-8, Ex. G, Ronaghan Dep. at 60; ECF 72-9, Ex. H, Police Rep. at 5–6). While Radzibaba and Smith restrained McCullough on the ground, Simmons cut the seatbelt to untangle McCullough (1:13:09–21).

At that point, McCullough was on the ground, lying on his belly (still tangled at 1:13:07 but untangled at 1:13:21), and the officers handcuffed him with his arms behind his back (1:13:26–52). Smith testified that McCullough stiffened his arms and hands at the moment when the officers tried to apply handcuffs, thus resisting; McCullough testified that he simply tensed up (ECF 66-6, Ex. 4, McCullough Dep. at 106). Once the handcuffs were on (1:13:52), McCullough made no attempts to resist. (ECF 72-5, Ex. D, Radzibaba Dep. at 44). Simmons applied his left knee to McCullough's upper back below his neck (removing knee at 1:15:49). (ECF 72-7, Ex. F, Simmons Dep. at 42, 46–47). The defendants' expert testified that "the placement and the duration of time . . . was in question" for this knee placement, raising

4

concerns about McCullough's ability to breathe, an unreasonable knee placement that was too close to the neck; the officers were not getting McCullough in a seated upright recovery position at the time. (ECF 72-6, Ex. E, Gleason Dep. at 13, 18, 19).

Once McCullough was on the ground, he said several times that he had a torn rotator cuff (1:13:16, 1:13:10, 1:13:23, 1:14:01), that he had had surgery (1:13:48, 1:15:00), and that he had his knee replaced (1:14:19). The officers understood this at the time. (ECF 72-5, Ex. D, Radzibaba Dep. at 39–42; ECF 72-3, Ex. B, Smith Dep. at 102). McCullough also said the officers had twisted his arm (1:14:47, 1:14:51). He expressed pain throughout. At one point, he told Simmons, "I told you I just had surgery," to which Simmons replied, "Well, then you should have cooperated." (1:14:49–1:15:03).

From about 1:15:49 a.m. to 1:16:44 a.m., Simmons searched and moved McCullough's person, manipulating McCullough's shoulders to roll him onto his side and feel all parts of his body through gloved hands. Simmons tried to close the car door, but the door could not move past McCullough's hands; once again, he rolled McCullough onto his side swiftly in order to try to finish closing the door (1:16:52). One of the officers ordered McCullough to bring his knee to his chest in order to clear the door (1:17:02), to which McCullough responded that he could not bend his knee past a certain point because of his surgery (1:17:03). Simmons responded that if he could drive, he could bring his knees to his chest (1:17:07–09). Radzibaba said, "Pick him up," and Simmons said to McCullough, "I'll help you!" while yanking McCullough up by his shoulder. With McCullough then hanging by his right shoulder, Radzibaba rushed to attempt to support McCullough from the shoulder on the other side of his body (1:17:19).

McCullough could not bend his knee. Simmons placed his left arm between McCullough's handcuffed arm and his back, running his left hand up McCullough's other arm to

his shoulder without special care for McCullough's shoulder condition (1:17:24). Simmons said, "Your knee wasn't bothering you when you were wrestling with us, was it?" (1:17:34). McCullough immediately denied that he had been wrestling with the officers.

After the arrest, the officers searched McCullough's vehicle (1:20:52), which Radzibaba testified would have been standard procedure to inventory the vehicle's contents prior to impoundment. (ECF 72-5, Ex. D, Radzibaba Dep. at 61–62). The cruiser recording the footage drove away at 1:22:13 while the search was in progress; the officers transported McCullough to University of Maryland Baltimore-Washington Medical Center for evaluation due to complaints of knee and arm pain. (ECF 72-9, Ex. H, Police Report at 4). McCullough was treated for "minor abrasions on his knees and given one band aid" by medical staff who "reported to Mr. Mccullough [sic] that he had no substantial injuries as [a] result of this incident." (*Id.*)

McCullough was later assessed and treated by a licensed social worker, Arthur Wagner, for the mental and emotional trauma he experienced. That social worker testified to physical injuries as well as to mood alterations that included "persistent and exaggerated negative beliefs or expectations," "persistent negative emotional state," "markedly diminished interest or participation in significant activities," and "feelings of detachment and estrangement from others." (ECF 72-10, Ex. I, Wagner Report at 6–7, 16). McCullough was hypervigilant and had difficulty sleeping. (Id.). This led to a diagnosis of Posttraumatic Stress Disorder (PTSD). (*Id.*) The social worker tied the diagnosis to the arrest encounter, though he noted that McCullough had also had other traumatic experiences in his life. (*Id.*).

After the incident, McCullough was charged with nine offenses: (1) speeding, (2) driving in excess of reasonable and prudent speed, (3) negligent driving, (4) failure to obey properly placed traffic devices, (5) disorderly conduct, (6) resisting arrest, (7) failure to obey a reasonable

lawful order, (8) driver use of horn when not reasonably necessary, and (9) disturbing the

peace/loud noise. He received a Probation before Judgment on the speeding charge but was

found not guilty on all other charges. *State of Maryland vs. Anthony McCullough*, Case No. C-

02-CR-16-002055 (Circuit Court for Anne Arundel County, 2016). McCullough pled "Not

Guilty" on July 26, 2017; this was also the date of his PBJ disposition and the start of his six

months of unsupervised probation.

  This was the only time in Smith's career that he arrested a driver for going 15 miles per

hour over the speed limit. (ECF 72-3, Ex. B, Smith Dep. at 77).

## LEGAL STANDARD

  Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party

of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit

under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477

U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving

party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable

inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see

also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the

same time, the court must "prevent factually unsupported claims and defenses from proceeding

to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### I. Causation evidence

The defendants produced medical causation expert testimony that "[n]one of

[McCullough's] current [physical] conditions or limitations can be attributed to the officers'

actions during the incident." (ECF 66-8, Ex. 6, Saltzman Report at 2). McCullough did not

present testimony from a medical causation expert, though he did depose the licensed clinical

social worker who provided mental healthcare after the incident. The defendants ask this court to

find, as a matter of law, that McCullough cannot prove causation without expert testimony.

McCullough argues that the defendants' conduct's causation of his injuries[4] can be established

by non-expert testimony.

"Expert testimony is not necessary to establish that which 'jurors, as ordinary [citizens],

would be aware of, as a matter of general knowledge.'" *Osunde v. Lewis*, 281 F.R.D. 250, 262

(D. Md. 2012) (quoting *Babylon v. Scruton*, 138 A.2d 375, 379 (Md. 1958)). "Thus, there are

'many occasions where the causal connection between a defendant's negligence and a disability

---

[4] McCullough's complaint asserts the following injuries:
- temporary and permanent physical injuries,
- physical pain and suffering,
- mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and
- economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees.

(ECF 16, Am. Compl. ¶ 102, Excessive Force claim). The complaint alleges that because of the encounter, (1) he dislocated his right shoulder and would require a second full rotator cuff surgery due to the aggravation (ECF 16 ¶ 45), (2) he required a total knee replacement, and (3) suffered extreme bruising throughout his body, broken veins on the back and side of his calf, and a fracture in his right hand (ECF 16 ¶ 46). His opposition to the motion for summary judgment mentions soreness and arm/shoulder/knee bruising (ECF 72 at 16, citing ECF 72-2, Ex. A, McCullough Dep. at 148–50) but does not mention or substantiate the complaint's allegations about new knee or shoulder surgeries. His social worker testified to McCullough's early descriptions of his physical injuries (injured knee, shoulder, broken hand, torn rotator cuff) and mental health symptoms. (ECF 72-10, Ex. I, Wagner Dep. at 16).

claimed by a plaintiff does not need to be established by expert testimony.'" *Osunde*, 281 F.R.D. at 262 (quoting *Greater Metro. Orthopaedics, P.A. v. Ward*, 810 A.2d 534, 538 (Md. Ct. Spec. App. 2002)). "This is particularly true 'when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge or observation.'" *Id.* This is especially the case when drawing connections between, for example, a car collision and bruises and other immediate physical injuries. *Wilhelm v. State Traffic Safety Commission*, 185 A.2d 715, 721 (Md. 1962).

But "[i]n many contexts, including those in which the injuries asserted are medical in nature, expert opinion is critical to establish causation. Indeed, in some circumstances the failure of a plaintiff to offer adequate expert opinion can result in summary judgment for the defendant." *Neal v. United States*, 2022 WL 374526 at *14 (D. Md. Feb. 8, 2022) (extensively reviewing at *14–*21 Maryland law on the necessity of medical causation evidence).[5] "Determining whether the particular injury asserted requires expert testimony to establish causation is often a difficult and fact-sensitive undertaking." *Id.* at *14. Indeed, the Maryland Court of Special Appeals surveyed the law and commented that "[i]t is impossible to frame any neat verbal formula that will prove readily dispositive of future cases." *S.B. Thomas, Inc. v. Thompson*, 689 A.2d 1301, 1310 (Md. Ct. Spec. App. 1997). The Fourth Circuit summarized the circumstances in which expert testimony is not required under Maryland law: (1) if "a disability develops coincidentally

---

[5] The *Neal* court cited as an example *Aventis Pasteur, Inc. v. Skevofilax*, 914 A.2d 113, 135–36 (Md. 2007) ("Despite three amended scheduling orders, and approximately 11 months allotted to conduct discovery, Respondents failed to produce an expert who could testify to specific causation within a reasonable degree of scientific certainty. Without such an expert, Respondents' claims must fail as a matter of law."). Unpublished cases are cited for persuasive reasoning, not as binding precedent.

with," or within a "reasonable time after," the subject act; or (2) if the proof of causation is

"clearly apparent" from the nature and circumstances of the injury; or (3) if "the cause of the

injury relates to matters of common experience, knowledge, or observation of laymen."

*Galloway v. Horne Concrete Const.*, 524 Fed. App'x 865, 871 (4th Cir. 2013). Under Maryland

law, "the causes of emotional disturbances are complicated medical questions, proof of which

must be made by expert medical testimony." *State v. Allewalt*, 517 A.2d 741, 747 (Md. 1986)

(citing *Johnson v. Zerivitz*, 198 A.2d 254, 255 (Md. 1964) (expert needed to link vehicle accident

to emotional disturbances, and to leg injury two years later)).

Despite a much wider initial array of injuries alleged in the complaint (ECF 16 ¶¶ 68–

69), the briefing on this motion for summary judgment focuses on the physical and mental pain

inflicted during the incident as well as the lingering psychological effects, including

Posttraumatic Stress Disorder. McCullough's response opposing the motion does not discuss the

longer-term physical injury aggravations alleged in the complaint, e.g., the new knee

replacement or rotator cuff surgeries he alleged were necessitated by the encounter. *See* n.4,

*supra*.

McCullough did not provide any medical causation expert testimony as to the physical

symptoms. At most, he offers testimony from his licensed clinical social worker recounting that

McCullough had complained of physical injuries shortly after the incident (ECF 72-10, Ex. I,

Wagner Dep. at 16) but the social worker merely relays McCullough's communications rather

than apply an expert opinion. But the physical pain and suffering caused by this incident (if

limited to general pain for the weeks after the encounter, rather than long-term aggravations of

pre-existing injuries requiring causal analysis) are not the kinds of "complicated issue[s] of

medical causation" that firmly require expert testimony under Maryland law. *Giant Food, Inc. v.*

*Booker*, 831 A.3d 481, 488 (Md. 2003). That requirement is more appropriate "to causally connect an incident involving a plaintiff and a non-immediate, late-onset injury experienced by that same plaintiff." *Osunde*, 281 F.R.D. at 262 (requiring expert testimony to causally connect a motor vehicle accident to the death — four months later — of the infant son of the plaintiff, who had been pregnant with the son at the time of the accident and needed an emergency premature caesarian section delivery afterward). The immediate physical pain and suffering caused by the altercation are within the reach of laymen and not "beyond the ken of the average" juror to understand. *See Ward*, 810 A.2d at 538. To the extent that McCullough's complaint alleged longer-term physical injuries and after-effects, his summary judgment briefing has abandoned those claims by failing to address them or substantiate them with evidence produced during discovery.

The mental and emotional symptoms present a more complicated question. Testimony from McCullough's licensed clinical social worker spoke to his mood alterations from the incident — "persistent and exaggerated negative beliefs or expectations, "persistent negative emotional state," "markedly diminished interest or participation in significant activities," and "feelings of detachment and estrangement from others." (ECF 72 at 16–17).[6] The social worker described McCullough's irritable behavior, hypervigilance, and difficulty sleeping. (*Id*; *see supra* n.6). These observations led to a PTSD diagnosis. (*Id*; *see supra* n.6). While the record reveals that McCullough had pre-existing PTSD (*see* ECF 83-1, Ex. 7, McCullough Dep. at 184), at a minimum there is a genuine dispute of fact as to the degree of new PTSD inflicted by the

---

[6] McCullough cites to ECF 72-10, Ex. I, Wagner Report at 6–7 to substantiate his factual assertions about Wagner's diagnosis of PTSD. Pages 6 and 7 of Exhibit I to ECF 72 do not contain this information, as they are not Wagner's report but rather excerpts from Wagner's deposition. Noting that the defendants have not challenged these factual assertions, the court presumes — favorably to McCullough — that these factual characterizations are accurate.

incident. Viewing that genuine dispute in the light most favorable to McCullough, the Wagner testimony — if believed — is sufficient to prove causation and avoid summary judgment.[7]

## II.  Municipal immunity for state claims

The officer-defendants argue that they are "municipal officials" immune from suit and from liability for malice-free tortious conduct within the scope of their public, discretionary duties.[8] Maryland grants public officials, including police officers, immunity from suit for negligent acts performed during the course of their discretionary duties. *Houghton v. Forrest*, 989 A.2d 223, 227–28 (Md. 2010); *see also* Md. Cts. & Jud. Pro. Code § 5-507 (2015) (codifying common law public official immunity for municipal officials). Such immunity, however, does not protect public officials from suit for grossly negligent or reckless discretionary acts. *Barbre v. Pope*, 935 A.2d 699, 717–19 (Md. 2007).

As police officers at the time of the incident, Smith, Radzibaba, and Simmons are entitled to statutory immunity as public officials for acts of negligence performed in the course of their discretionary duty. The officers argue that McCullough has not properly pled malice or gross negligence and has failed to overcome their immunity. While there is little evidence of malice in the record, there is evidence which, when viewed in the light most favorable to McCullough, could support a finding of gross negligence or recklessness on the officers' part — for example, lifting McCullough to his feet by one injured shoulder as Simmons did before Radzibaba could

---

[7] The defense identified Dr. Michael Spodak as an expert psychiatric witness. (ECF 72-11, Ex. J., Spodak Dep.).

[8]  Md. Code Ann. CJP § 5-507(a)(1)–(2) (West 2022) provides that:

(1) An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

(2) An official of a municipal corporation is not immune from liability for negligence or any other tort arising from the operation of a motor vehicle except as to any claim for damages in excess of the limits of any applicable policy of motor vehicle liability insurance.

step in to support McCullough's other side. The record includes defense expert testimony calling

into question the reasonableness of the knee-on-upper-back restraint used by Simmons (*see* n.12,

*infra*). Given the viability of a gross negligence claim (*see* § IX, *infra*) based on excessive force

(*see* § III, *infra*), a genuine dispute exists, and summary judgment on the issue of statutory and

common law immunity is not warranted. The court will **Deny** the officers' municipal-immunity-

based argument for immunity from the state law claims.

### III. Excessive Force (Counts II and VII)

As established at the motion to dismiss stage, Maryland's Probation Before Judgment

process spares participants from a final judgment of conviction but includes a finding of guilt.

(ECF 32 at 16–18). Therefore, a disposition of PBJ is equivalent to a conviction for the purposes

of *Heck v. Humphrey*, a 1994 Supreme Court case that bars § 1983 claims where a judgment for

the plaintiff would necessarily imply the invalidity of the plaintiff's conviction, unless the

plaintiff can prove the conviction's invalidity or reversal. *Heck v. Humphrey*, 512 U.S. 477, 486–

87 (1994); *compare Stutzman v. Krenik*, 350 F. Supp. 3d 366, 379–80 (D. Md. 2018) (a finding

of guilt in the PBJ case — even absent a judgment of conviction — would necessarily be

undermined by a subsequent state or federal civil rights suit that successfully challenged the

underlying arrest) with *Tomashek v. Raleigh County Emergency Operating Center*, 344 F. Supp.

3d 869, 871, 874–75 (S.D. W. Va. 2018) (finding a West Virginia pretrial diversion program was

not a *Heck* conviction, because there was no finding of guilt); *see Lail v. Caesar*, 2022 WL

672164 at \*4–\*6 (E.D. Va. Mar. 7, 2022) (discussing *Stutzman* and *Tomashek*). In McCullough's

case, this means that any state or federal claims that rest on the unlawfulness of the initial traffic

stop or arrest are barred, as the PBJ disposition establishes that Smith had probable cause[9] to stop and arrest McCullough. This includes counts I, II, and IV (§ 1983 claims for due process and equal protection, excessive force, and unlawful search, respectively) and counts VI, VII, and IX (the parallel state claims) to the extent that the claims or arguments rest on the alleged unlawfulness of the search.[10]

Having established that there was probable cause for the traffic stop and for the arrest, the next question is whether, as federal § 1983 count II and state count VII allege, the officers used excessive force in effectuating the arrest; this violation could persist even given a lawful stop and arrest. McCullough's excessive force claims allege that the officers knowingly used greater force than necessary.[11] At issue is the way the officers extracted, restrained, and moved McCullough despite his statements about his recent surgeries — in particular:

- pulling him out of the car while tangled in the seatbelt,

- handcuffing him behind his back despite knowledge of his shoulder surgeries,

- roughly rolling him by his shoulders while searching him despite knowledge of his shoulder surgeries,

- lifting him swiftly by one shoulder despite knowledge of his shoulder surgeries, and

---

[9] The court notes McCullough's deposition testimony averring that he was not speeding. This is not, as the defendants reply, a mere self-serving statement that cannot create a genuine dispute of material fact. In situations where a plaintiff does not offer "mere speculation" or just his "opinion," but rather testimony "as to the facts surrounding" a particular incident, summary judgment is improper. *Lilly v. Crum*, No. 2:19-cv-00189, 2020 WL 1879469, at *4 (S.D. W. Va. Apr. 15, 2020); *see also EEOC v. Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004) (distinguishing self-serving opinions from testimony citing alleged facts for purposes of summary judgment). After all, Rule 56 does not contain a corroboration requirement or bar self-serving testimony, and a court may not credit the evidence of the moving party while disregarding the evidence of the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 659 (2014) (vacating summary judgment award for this reason). However, the existence of the PBJ eliminates the dispute of material fact as to whether McCullough was speeding and, consequently, whether the arrest was lawful.

[10] The only unlawful search claim that remains from counts IV (federal) and IX (state) is for the allegedly unlawful search of McCullough's vehicle; *see* § VII, *infra*.

[11] McCullough's initial complaint alleged that his shoulder had been dislocated during the encounter, but the summary judgment briefing does not mention this or offer any evidence to support it. (ECF 16 ¶¶ 93, 164).

14

- placing knee pressure on his upper back below his neck.

The defendants argue that summary judgment is warranted in their favor because the evidence demonstrates that the force used against McCullough during his arrest was reasonable. (ECF 66-1 at 11).

Claims of excessive force during an arrest or investigatory stop are examined under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395–97 (1989); see also *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) (the framework for analyzing excessive force claims is set out in *Graham*.). Reasonableness is assessed by weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Mendez*, 137 S. Ct. at 1546 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The operative question is "whether the totality of the circumstances justifies a particular sort of search or seizure." *Id.* (quoting *Garner*, 471 U.S. at 8–9). Factors to be included in making this determination include (1) the severity of the crime at issue, (2) whether there is an immediate threat to the safety of the officer or others, and (3) whether the subject is resisting arrest or attempting to flee. *See Graham*, 490 U.S. at 396. The determination is to be made "'from the perspective of a reasonable officer on the scene' ... 'based upon the information the officers had when the conduct occurred.'" *Mendez*, 137 S. Ct. at 1546 (first quoting *Graham*, 490 U.S. at 397; then quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)). "[T]he right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

This traffic stop featured four irregularities that influence the analysis. First, McCullough did not turn off his engine immediately after pulling over, instead leaving it on. This made

15

possible the second irregularity: because of the cruiser lights shining brightly in his rearview mirror and a desire to pull over closer to the curb, McCullough moved his car by about two car lengths (at 1:11:03) after having stopped initially. Third, McCullough's limited shoulder mobility (caused by his recent surgery) made it impossible for him to put his right hand out the driver's side window as directed by Smith after the second stop, so he attempted to comply by putting his left hand out the window and his right hand out of the sunroof, which was more easily within reach. Fourth, he intended to record the police interaction and was holding his mobile phone, though from a distance and in the dark, the officer may not have recognized it as a cell phone.

The crime at issue — speeding — is not a serious offense, so the first *Graham* factor weighs in McCullough's favor. *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) (noting first *Graham* factor weighs for a plaintiff when there was no offense or the offense was minor); *see United States v. Wallmeyer*, No. 87-5506, 1987 WL 38496 at *3 n.2 (4th Cir. Aug. 13, 1987) (characterizing a speeding conviction as minor), *Sebastian v. Ortiz*, 918 F.3d 1301, 1309 (11th Cir. 2019) (weighing the first *Graham* factor for the plaintiff because speeding "is a minor, noncriminal offense").

The second factor — the existence of an immediate threat to Smith's or others' safety — is less clear. Weighing in the defendants' favor are the facts that McCullough did not immediately turn off his engine, that he moved his car forward somewhat unpredictably after the initial stop, and that he did not stick both hands out of the driver's side window. The defendants argue that Smith reasonably feared McCullough would use his car offensively, though it is unclear how moving the vehicle up by a few feet (away from the officer and his cruiser) and then stopping would lead to an inference of offensive possibility. Weighing in McCullough's favor

16

are the facts that he stopped his car and attempted to comply after moving his car and after Smith

had repositioned his own car; that he did attempt to show his right hand in a way that was

physically possible for him; and that Smith physically took and discarded the "unknown object"

(McCullough's cell phone) well before the allegedly excessive force, meaning Smith (according

to McCullough) had time to know it was a cell phone and not a weapon. The parties dispute

when Smith knew that the object was a cell phone and not a weapon: the defendants claim Smith

only determined it was a cell phone after McCullough was handcuffed (ECF 66-1 at 5–6,

referring to 1:14:39), whereas McCullough asserts that Smith knew immediately upon holding

and throwing the object that it was a phone (ECF 72 at 23, referring to 1:12:23). That is to say,

the defendants say Smith perceived the existence of a possible weapon before and during the use

of allegedly excessive force, and McCullough says Smith knew well before the use of excessive

force that there was no indication of a weapon. This factual dispute bears directly on Smith's

understanding of McCullough's possible threat level.

The third factor — whether the suspect was resisting or attempting to flee — seems to

weigh in favor of McCullough but is not clear. Here, too, there are genuine disputes of material

fact. The parties first dispute whether Smith activated the car's security system (and therefore its

horn) while reaching into the car to remove the keys (ECF 72 at 18 n.1; ECF 72-2, Ex. A,

McCullough Dep. at 78) or whether, as an act of resistance to the arrest, McCullough honked the

horn (ECF 66-1 at 6). Second, they dispute whether McCullough complied or did not comply

with orders or whether full compliance was even possible with conflicting orders to both show

his hands and turn off the ignition or to exit the vehicle even while being pinned to the seat by

officers handling the seatbelt. (ECF 72 at 23; ECF 66-1 at 6). Third, the parties dispute whether

McCullough physically resisted being handcuffed, with the defendants arguing that McCullough

resisted by tensing up his body during the extraction (ECF 66-1 at 21) and McCullough arguing that he could not bring his hands back into the vehicle to remove his seatbelt and then could not disentangle himself from his seatbelt while the officers extracted him from the car (ECF 72 at 32). Additionally, the parties dispute whether McCullough resisted being handcuffed or was simply adjusting his arms after being twisted into a position that caused significant pain due to his prior shoulder surgeries. (ECF 72-7, Ex. F, Simmons Dep. at 25–27; ECF 72-2, Ex. A, McCullough Dep. at 152). Finally, the parties dispute whether the officers exercised more force than necessary to effectuate the arrest when they (1) twisted McCullough's arms to apply handcuffs; (2) applied Simmons's knee to his upper back, just below his neck;[12] (3) rocked him left and right by his shoulders while handcuffed; and (4) used an "escort" technique to lift McCullough to his feet even after McCullough told them he had had double rotator cuff surgeries. (ECF 72-2, Ex. A, McCullough Dep. at 123; ECF 72-7, Ex. F, Simmons Dep. at 56–57).

Accepting the facts in the light most favorable to McCullough, there are a variety of genuine issues of material fact that bear on the *Graham* factors, which govern the excessive force inquiry. A reasonable jury could find either way in these factual disputes, which would then determine whether it was objectively reasonable for the officers to fear for their safety or to act based on the possibility of resistance or flight. The defendants' motion for summary judgment will therefore be **Denied** as to the federal (count II) and state (count VII) excessive force claims.

---

[12] The "placement and the duration of time . . . was in question" for the knee on McCullough's back; placing "one's knee on the back of a suspect raises concerns about the suspect's ability to be able to breathe" and was worthy of concern. (ECF 72-6, Ex. E, Gleason Dep. at 13, 18–19).

**IV. Qualified immunity for § 1983 claims**

With respect to McCullough's § 1983 claims, the defendant officers argue that they are protected from suit under the doctrine of qualified immunity. The court considers this defense only as to the federal § 1983 claim based on excessive force, as the other § 1983 claims are addressed elsewhere (*see* §§ VI and VII, *infra*).

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages in a Section 1983 suit as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants bear the burden of proving their entitlement to qualified immunity. *Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014). To prevail on a qualified immunity defense, a government official must demonstrate either (1) that the facts, construed in the plaintiff's favor, do not constitute a violation of the plaintiff's constitutional rights, or (2) that the right infringed upon was not clearly established at the time of the alleged violation. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 231–33, 236.

An officer's conduct violates clearly established law "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). Although there need not be a case directly on point for the law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond

19

debate." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). The Supreme Court has emphasized that the "clearly established law" should not be decided at a "high level of generality" but instead it must be "particularized" to the facts of the case and the law determined beyond debate. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal citations omitted). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). When a plaintiff can identify "cases of controlling authority in the jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority" affirming the allegedly violated right, the law may be clearly established. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). "The 'exact conduct at issue need not' previously have been deemed unlawful for the law governing an officer's actions to be clearly established." *Sims v. Labowitz*, 885 F.3d 254, 262 (4th Cir. 2018) (quoting *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001)).

The parties disagree over the proper scope of conduct for the inquiry into the officers' qualified immunity defense. The officers restrict it to the handcuffing alone, arguing that there was no clearly established right that a plaintiff who makes a complaint of pain (or pre-existing injury or surgery) must have his handcuffs placed in front of him. McCullough instead urges a broader inquiry that accounts not just for the handcuffing but for the overall allegedly excessive force used in the arrest. He notes that the officers restrained him by violently twisting his arms; handcuffed him behind his back despite knowledge of his shoulder surgeries; restrained him with a knee-on-upper-back technique whose position and duration raised concerns about his breathing (ECF 72 at 10–11); rocked him to the left and right while he was handcuffed; and used an

"escort" technique to haul him to his feet despite being unable to bend his knees. In other words, according to McCullough, the inquiry here should examine the totality of the allegedly excessive force in the encounter, which included (but was not limited to) behind-the-back handcuffing despite prior injuries.

Two Fourth Circuit cases have denied qualified immunity to law enforcement officers for the gratuitous use of force in somewhat analogous situations. First, in *Jones v. Buchanan*, the court held that an officer who knocked a drunk and disorderly, but already handcuffed, individual to the ground in a secured room engaged in excessive use of force. 325 F.3d 520, 532 (4th Cir. 2003). Denying the officer qualified immunity, the court reasoned that "years before 1999, it was clearly established that a police officer was not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others ..." *Id.* at 534. Second, in *Bailey v. Kennedy*, the Fourth Circuit denied qualified immunity to officers who continued to use force to roughly manipulate the body of an initially resistant suspect who, by that time, had been fully secured. 349 F.3d 731, 745 (4th Cir. 2003). The court found unreasonable officers' kicks and blows that continued "after Michael was bound hand and foot and lying face down on the floor." *Id.* at 744.[13]

Although the Fourth Circuit has not spoken directly on the need for officers to modify their application of force with knowledge of a prior surgery that might be aggravated by certain uses of force, there is "a consensus of persuasive authority . . . that when a police officer had reason to know of an arrestee's injury, the officer's refusal to handcuff an individual in the front, *or to otherwise refrain from aggravating the injury during the arrest process*, can violate the arrestee's constitutional rights." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 385–86 (D. Md. 2018)

---

[13] In both *Jones* and *Bailey*, the plaintiff had committed no offense; here, the only offense was the minor one of speeding.

(denying qualified immunity where (1) the plaintiff had told the officer at least three times that he was injured and that handcuffing him behind his back would further injure him; (2) the plaintiff screamed out in pain throughout the encounter; and (2) the plaintiff was cooperative and did not pose a threat) (emphasis added).[14] The officers here were sufficiently on notice of the controlling legal principle: officers are to use only the force reasonably necessary to secure a defendant, and the force ceases to be reasonably necessary when there is no resistance or when the defendant is secured. As in *Stutzman*, the officers here knew[15] or had reason to know of McCullough's prior condition, and even assuming that the moment in which his body tensed did constitute initial resistance to the arrest, it is undisputed that he did not resist after being handcuffed.

While the officers point to the lack of extraneous strikes or blows, McCullough points to the post-handcuffing knee-on-back, among other items. Law clearly established in *Jones* and *Bailey* and summarized in *Stutzman* provided the officers sufficiently particularized and unambiguous notice that the continued application of unnecessary force on someone after he has stopped (or, as disputed, was never) resisting and does not pose a threat to the officers or others constitutes excessive force. Even assuming that the force was reasonable leading up to the

---

[14] The *Stutzman* court discussed Sixth, Tenth, and Eighth Circuit precedents to that effect and distinguished conflicting First and Second Circuit cases where those courts did not dispute the general consensus that "when a police officer has reason to know of an arrestee's injury from a claim by a cooperative suspect, or by any suspect with a visible injury, the officer's refusal to handcuff the individual in the front so as to avoid a resulting further injury would violate the arrestee's constitutional rights." *Stutzman*, 350 F. Supp. 3d at 386.

[15] Where officers did not know or have reason to know that the ordinarily accepted handcuffing technique would aggravate a preexisting condition, courts have granted qualified immunity. *Cf. Rodriguez v. Farrell*, 240 F.3d 1341, 1353 (11th Cir. 2002) ("What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time."). But "[i]f an officer, for instance, needlessly handcuffed an injured driver who crashed his vehicle while speeding and seriously aggravated the injuries caused by the accident, the fact that the officer harmed the driver by 'merely' applying handcuffs would not necessarily bar an excessive force claim." *Sebastian v. Ortiz*, 918 F.3d 1301, 1309 (11th Cir. 2019) (distinguishing *Rodriguez* based on the officer's intentional and gratuitous infliction of substantial injury and rejecting the officer-defendant's argument that handcuffing alone can never constitute excessive force).

handcuffing (though the extraction and seatbelt entanglement remain relevant), the post-handcuffing knee-on-back pressure, rocking by the shoulder, and lifting by the shoulder could violate clearly established law when applied to an individual who, if McCullough's version of events is credited, was not resisting, had prior shoulder injuries, and posed no threat. Accordingly, the court finds qualified immunity not applicable as to the § 1983 excessive force claim, and summary judgment will be denied as to count II (*see* § III, *supra*).

## V. Battery (count XVIII)

McCullough alleges common law battery. Battery is the "unlawful application of force to the person of another." *Snowden v. State*, 583 A.2d 1056, 1059 (Md. 1991). A police officer, however, is not liable for battery when using a reasonable amount of force to effectuate a lawful arrest. *See Ashton v. Brown*, 660 A.2d 447, 471 n.24 (Md. 1995); *Hines v. French*, 852 A.2d 1047, 1055–56 (Md. Ct. Spec. App. 2004). To the extent that McCullough argues battery because the arrest was supposedly unlawful, the court will **Grant** summary judgment to the defendants. But a genuine dispute of material fact remains as to whether the officers used excessive force in arresting McCullough. To that extent, the court will **Deny** the defendants' motion for summary judgment. *See Stutzman*, 350 F. Supp. 3d at 383.

## VI. Due process and equal protection (counts I and VI)

McCullough's complaint alleged sprawling federal § 1983 (count I) and state (count VI) due process and equal protection claims. To the extent that those claims related to the lawfulness of the traffic stop, arrest, or search of McCullough's person or the defendants' failure to render aid, they were dismissed earlier. (ECF 32 at 20, 20 n.23). To the extent that those claims relate to the alleged unlawful search of McCullough's vehicle, the court will grant the defendants summary judgment. *See* § VII, *infra*.

The Equal Protection Clause generally requires the government to treat similarly situated people alike. *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To state a claim under the Equal Protection Clause, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

McCullough points first to the fact that he is the only person Smith has ever arrested for driving 15 miles per hour over the speed limit, and he is black. This allegation of differential treatment is conclusory and not supported by the record; McCullough has not shown that the comparison pool (fifteen-miles-per-hour-over-the-limit speeding violators whom Smith did not arrest) contained few or no African-Americans. McCullough also points to county officers' racially disparate traffic stop and search rates, but, as noted before, Smith had probable cause to stop McCullough for speeding. Finally, while an equal protection claim based on alleged excessive force during a lawful arrest may be viable under some circumstances, McCullough has failed to show discriminatory intent beyond conclusory allegations that the officers used excessive force based on his race. The court will grant summary judgment on counts I and VI, to the extent that they survived both the motion to dismiss and this opinion's separate analysis of the vehicle search.

## VII.        The vehicle search (Counts IV and IX)

Counts IV (ECF 16 ¶ 122) and IX (ECF 16 ¶ 193) challenge the warrantless search of McCullough's vehicle according to federal and state law.[16] A vehicle search incident to arrest

---

[16] These counts also challenge the traffic stop, arrest, and search of his person, but the seizure-related claims were dismissed at the motion to dismiss stage, because the PBJ establishes that there was probable cause to believe McCullough had been speeding before the incident. (ECF 32 at 16–18). Probable cause and the subsequent lawful arrest for that misdemeanor render the search of his person a valid search incident to arrest.  No seizure-related

does not comply with the Fourth Amendment unless police reasonably believe that the arrestee

"could have accessed his car at the time of the search or that evidence of the offense for which he

was arrested might have been found therein[.]" *Arizona v. Gant*, 556 U.S. 332, 344 (2009). The

*Gant* Court noted that "when a recent occupant is arrested for a traffic violation, there will be no

reasonable basis to believe the vehicle contains relevant evidence." *Id.* at 343. McCullough was

restrained at the time of the search, and he was arrested for speeding, so there was no reasonable

basis to believe his car contained evidence.

The automobile exception to the warrant requirement having been eliminated, the

defendants argue in the alternative that the warrantless search was an inventory search of

McCullough's car. The Fourth Circuit has summarized inventory searches as:

> "A proper inventory search is merely an incidental administrative step
> following arrest and preceding incarceration, conducted to protect the
> arrestee from theft of his possessions, to protect the police from false
> accusations of theft, and to remove dangerous items from the arrestee
> prior to his jailing. An inventory search, however, must be conducted
> according to standardized criteria, such as a uniform police department
> policy. For an inventory search to be lawful, the vehicle searched must be
> in the lawful custody of the police. If the vehicle is in lawful custody, the
> police may inventory the vehicle, if such inventories are routine and
> conducted pursuant to the standard police procedures, so long as the
> purpose of the inventory is to secure the car or its contents and not to
> gather incriminating evidence against the owner."

*United States v. Murphy*, 552 F.3d 405, 412 (4th Cir. 2009), abrogated on other grounds by *Riley*

*v. California*, 573 U.S. 373 (2014) (abrogation recognized in *United States v. Burton*, 756 Fed.

App'x 295, 302 (4th Cir. 2018)). Depending on departmental standard procedure, courts have

upheld inventory searches conducted at the scene before towing, at the police station, or at the

impound lot. *Murphy*, 552 F.3d at 413. Maryland courts construe Article 26 as being in *pari*

claims remained after the motion to dismiss, and the only search-related claims that survived related to the search
of McCullough's vehicle. (ECF 32 at 18–19).

*materia* with the federal provision and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment. *Scott v. State*, 782 A.2d 862, 873 (Md. 2001).

McCullough has not challenged the defendants' assertion of a valid inventory search, and the record contains at least one reference to the department's standard criteria. (ECF 66-7, Ex. 5, Radzibaba Dep. at 61–62). Despite the absence of an actual inventory list, discovery and the briefing have surfaced no genuine dispute as to any fact material to the question of whether the warrantless search of McCullough's car was a valid inventory search. Therefore, the court will **Grant** the defendants summary judgment as to the federal § 1983 claim based on the unlawful search of his vehicle (count IV) and the parallel state claim under the Maryland Declaration of Rights (count IX).

## VIII.     Malicious prosecution disputes of fact (Count XI)

The officers also move for summary judgment on the malicious prosecution[17] claim (count XI), arguing (1) that there was probable cause for each of the proceedings and (2) there was no evidence of malice or a primary purpose other than bringing McCullough to justice.

"The elements of malicious prosecution are: 1) a criminal proceeding instituted or continued by the defendant against the plaintiff, 2) termination of the proceeding in favor of the accused, 3) absence of probable cause for the proceeding, 4) 'malice' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Villeda v. Prince George's County*, 219 F. Supp. 2d 696, 702 (D. Md. 2002). The defendants concede the first two elements but challenge the absence of probable cause and the presence of malice or another inappropriate primary purpose.

---

[17] McCullough's malicious prosecution claim is limited to charges related to disorderly conduct, resisting arrest, failure to obey a reasonable lawful order, driver use of horn when not reasonably necessary, and disturbing the peace/loud noise. (ECF 33, Order on Mot. Dismiss ¶ 3; ECF 66-1 3 n.6).

The parties' key disagreement hinges on the distinction between disputes of fact as to the events of that night and disputes over the less demanding question of whether there was probable cause to believe McCullough had committed various wrongful acts. First, McCullough is correct that a factual dispute remains as to the cause of the prolonged horn honking, which is the conduct in question for malicious prosecution as to the driver use of horn when not reasonably necessary, disorderly conduct, and disturbing the peace/loud noise charges. The video shows that Smith reached into the car to grab McCullough's keys; an instant later, when his hands were outside the car, the horn blew. The defendants claim that McCullough was responsible for sounding the horn. McCullough argues that Smith set the car's security system off when he reached in to remove the keys. This is key to those three offenses.

Second, the parties dispute whether McCullough resisted arrest. Smith notes that as McCullough was being hauled from the vehicle, he tensed his body, a reaction that Smith understood to be resistance. McCullough argues that a moment of tension in his body is not resistance, especially when followed by a sustained period of compliance. The video does not show — and the officers do not argue that there was (ECF 66-1 at 21) — a prolonged struggle, but rather a moment of tension.

Finally, the parties dispute whether McCullough failed to obey a reasonable lawful order. The officers argue that Smith ordered McCullough to show his hands, turn the car off, and exit the vehicle. The degree of McCullough's compliance is unclear. While he did not put both of his hands out the left window, he argues that he complied as far as he could due to his limited mobility (due to his weight and prior injuries) — he placed his left hand out of the driver's side window and showed his right hand through the sunroof. Puzzling as this decision may have been for Smith, the parties dispute whether this is non-compliance.

But these factual disputes all speak to the substantive criminal charges, of which McCullough was acquitted in his state court criminal trial. The inquiry for this court in a malicious prosecution claim is not whether the charges could be proven beyond a reasonable doubt, but whether there existed probable cause for these charges, that is, whether there was a reasonable basis for believing that these crimes had been committed. The test for probable cause is not reducible to precise definition or quantification. *Florida v. Harris*, 568 U.S. 237, 243 (2013). It is not a high bar, requiring "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* at 244 (contrasting probable cause with more "finely tuned" standards like proof beyond a reasonable doubt or by a preponderance of evidence). Courts conduct this "practical and common-sensical" inquiry by looking to the totality of the circumstances, rejecting "mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id.* Applying that standard to McCullough's case, no reasonable jury could find that the officers could not have reasonably believed that McCullough triggered his horn, tensed his body in resistance, or refused to comply with Smith's order to show his hands through the driver's-side window. As a matter of law, probable cause existed for these offenses, which themselves were part of a larger proceeding anchored by a speeding charge with probable cause established by the Probation Before Judgment. Further, while the use of excessive force remains in dispute, there is little to no evidence of malice or a primary purpose outside of taking McCullough into custody for the offenses he was charged with. The court will **Grant** the defendants summary judgment as to McCullough's malicious prosecution claim (count XI).

## IX. Gross Negligence (count XIII)

Under Maryland law, gross negligence is

> something more than simple negligence, and likely more akin to reckless conduct . . . [G]ross negligence is an intentional failure to perform a

> manifest duty in reckless disregard of the consequences as affecting the life
> or property of another, and also implies a thoughtless disregard of the
> consequences without the exertion of any effort to avoid them. Stated
> conversely, a wrongdoer is guilty of gross negligence or acts wantonly and
> willfully only when he [or she] inflicts injury intentionally or is so utterly
> indifferent to the rights of others that he [or she] acts as if such rights did
> not exist.

*Cooper v. Rodriguez*, 118 A.3d 829, 845–46 (Md. 2015) (cleaned up). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Taylor v. Harford Cnty. Dep't of Social Servs.*, 862 A.2d 1026, 1034 (Md. 2004) (citation and internal quotation marks omitted).

Moving for summary judgment, the defendants argue that the force used to handcuff and move McCullough was reasonable, and there was no evidence of an intentional or "utterly indifferent" infliction of harm. While the evidence of gross negligence is not strong, a reasonable jury could find the defendants' conduct grossly negligent in the force used to arrest McCullough. *Cf. Stutzman*, 350 F. Supp. 3d at 383. The court will therefore **Deny** summary judgment as to the gross negligence claim (count XIII).

## X. Pattern or Practice claims (Counts V and X)

Counts V and X remain bifurcated and stayed until the resolution of the rest of the claims in this case.

### CONCLUSION

For the reasons discussed herein, the defendants' motion for summary judgment will be granted in part and denied in part. A separate Order follows.

3/30/22
Date

_____
Catherine C. Blake
United States District Judge

29